**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Mark Skiba, | ) | |
| Plaintiff, | ) | |
| | ) | No. 18 C 3381 |
| v. | ) | |
| | ) | Judge Ronald A. Guzmán |
| Illinois Central Railroad Co., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, Defendant's motion for summary judgment [131] is denied. The parties shall confer and, no later than February 24, 2021, submit a statement containing proposed dates for trial between January and March 2022 and indicating how long the trial is estimated to last.

## STATEMENT

Plaintiff claims that Defendant repeatedly violated his right to be free from offensive and objectionable intrusion into his private affairs by forcing him to submit to unnecessary drug and alcohol testing, which Defendant argues was required by the U.S. Department of Transportation ("DOT"). Defendant moves for summary judgment.

**Facts**

On March 4, 2013, following the elimination of his previously-held management position, Plaintiff accepted a union position with Defendant as an extra board clerk in the Transportation Department. Katie Roop was a Senior Supervisor in the Transportation Department who was responsible for overseeing Plaintiff. Cheryl Clark, Sequia Wiggins, and Doug Townsend were also supervisors who oversaw Plaintiff. Plaintiff's extra board-clerk position involved training on the tower.[1] On July 31, 2013, Supervisor Clark completed Plaintiff's employee evaluation and confirmed that he was trained and qualified for three tower positions, which meant that he was subject to assignment as a relief Tower Operator. Defendant contends that a Tower Operator is a DOT-covered/safety-sensitive position, which Plaintiff disputes. Plaintiff further disputes that he was offered or accepted a position working on the tower.

---

[1] The parties do not describe what it means to work "on the tower," but the details are immaterial to the instant motion.

On October 2, 2013, Plaintiff bid on and was awarded a relief clerk position in the Transportation Department and began training for that position. Defendant asserts that Plaintiff remained subject to assignment as a relief Tower Operator while training for the position of relief clerk, which Plaintiff disputes. DOT-covered and/or safety-sensitive positions are subject to federal DOT regulations and drug-testing requirements, which include direct-observation urine collections under certain circumstances. *See* 49 C.F.R. § 40 *et seq.* A railroad company's Designated Employee Representative ("DER") is the individual responsible for ordering all federally-mandated employee drug and alcohol tests pursuant to 40 C.F.R. § 219. On October 9, 2013, as part of an effort to update the drug-testing pools for federally-regulated employees, Joanne Ricevuto, a Medical Services employee and DER for Defendant, sent supervisors a list of employees working in DOT-covered service/safety-sensitive positions. Ricevuto requested the names of any employees who should have been, but were not, on the list, and asked the supervisors to identify any employees who were improperly included on the list.

On October 18, 2013, Supervisor Clark responded to Ricevuto's email, identifying additional employees, including Plaintiff, who were working in her department in a DOT-covered service/safety-sensitive position. On October 29, 2013, Ricevuto ordered Clark to set up DOT pre-employment tests for the employees in Clark's department who were being added to the federal testing pools and who needed a DOT pre-employment test; Plaintiff was one of those employees.

Acosta is an outside medical vendor contracted by Defendant to administer drug and alcohol tests. On October 31, 2013, an Acosta employee attempted to administer to Plaintiff the urine drug test ordered by Ricevuto. Plaintiff told the Acosta collector that he was no longer a DOT-covered employee and that he already had submitted to a pre-employment drug test. After the Acosta collector informed Ricevuto of Plaintiff's statements, Ricevuto canceled the scheduled test and checked Defendant's records to determine whether Plaintiff needed the test. Ricevuto confirmed that Plaintiff had not previously submitted to a DOT pre-employment test and was currently working in a position subject to assignment as a Tower Operator. Thus, she determined that Plaintiff was required under federal law to take the test.

Accordingly, on November 1, 2013, Ricevuto again ordered Supervisor Clark to set up the DOT pre-employment urine drug test for Plaintiff. When Plaintiff was informed that an Acosta collector was present to administer the test, he protested to Supervisors Roop, Clark and Wiggins, stating that he should not be required to take the test. While verbally protesting to his supervisors, Plaintiff prepared a handwritten note, declaring that he was "disqualifying" himself from a tower position. Plaintiff's supervisors informed him that he could not disqualify himself from a tower position, and that he was required under federal law to take the test. When Plaintiff continued to protest, a supervisor sought assistance to remove Plaintiff from service for insubordinate behavior. Believing that he could be fired from his job for refusing the test, Plaintiff acceded to taking the test and provided a urine sample to the Acosta collector. Nevertheless, Plaintiff was subsequently removed from service for insubordination and was escorted out of the building by one of Defendant's employees.

The DOT pre-employment test that Plaintiff submitted to on November 1, 2013 was not a direct-observation test,[2] although Plaintiff claims that Supervisor Clark told the collector to accompany Plaintiff into the bathroom. Following the November 1, 2013 incident, Plaintiff admitted that his conduct may have upset his supervisors and apologized in a letter.

On November 8, 2013, Ricevuto was informed that Plaintiff's November 1, 2013 test was positive for marijuana, and Defendant sent Plaintiff a letter so informing him. Plaintiff admits that he used marijuana on a date shortly before his November 1, 2013 test and does not dispute the accuracy of the lab results. On or around that same time, Defendant informed Plaintiff that there would be a disciplinary hearing regarding his insubordination and positive drug test. At the November 20, 2013 hearing, Plaintiff admitted that he was a qualified Tower Operator at the time he was instructed to take the drug test, and that both Supervisors Roop and Clark had informed him that if there was an emergent need for a Tower Operator, they could assign him to work at the tower.

Defendant thereafter directed Plaintiff to meet with a substance abuse professional ("SAP"), who required Plaintiff to attend drug counseling as a condition of his return to employment. On December 2, 2013, Defendant sent Plaintiff a discipline-determination letter, indicating that he was to be suspended without pay for six months for drug use and ten days for insubordination. On April 12, 2014, SAP Thomas Reed sent Ricevuto the federally-required follow-up plan for Plaintiff. Plaintiff contends that he should not have been subject to a follow-up plan because he did not work in a safety-sensitive position and did not consent to work in one. The plan required Plaintiff to submit to a direct-observation urine drug test in order to return to work and additional follow-up direct-observation urine drug tests over the course of the next 36 months.

On May 7, 2014, Plaintiff signed the Illinois Central Agreement to Undergo Toxicological Testing as a condition of his return to work. While Defendant asserts that Plaintiff signed the document voluntarily, Plaintiff asserts that he could not consent to improper DOT testing. On May 7, 2014, Ricevuto ordered Plaintiff to submit to the direct-observation urine drug test in order to return to work, as required by SAP Reed's follow-up plan. Plaintiff submitted to the test but denies that he consented to it. Plaintiff's return-to-work direct-observation urine drug test, as well as all of Plaintiff's subsequent direct-observation follow-up urine drug tests, were federally required to be observed. Plaintiff admits that the administration of the direct-observation tests was in accordance with federal procedure for employees who are properly subject to return-to-work drug testing, but he contends that he should not have been required to submit to such testing.

On May 9, 2014, Ricevuto received notice that Plaintiff had passed his May 7, 2014 urine drug test, so she informed Plaintiff and his supervisors that Plaintiff was medically cleared to

---

[2] An employee who is undergoing a DOT direct-observation collection goes into a bathroom with a monitor and is required to lift his shirt and lower his pants to fully expose his body and genitals. The employee is required to turn around in a complete circle and urinate into a cup as the monitor observes the elimination.

return to work.   On May 9, 2014, Supervisor Roop contacted Ricevuto to inquire whether
Plaintiff was cleared to work a future scheduled assignment as a relief Tower Operator at Ship
Canal.   While Defendant asserts that as of May 9, 2014, Plaintiff was still subject to assignment
as a relief Tower Operator, Plaintiff disputes this statement of fact based on his failure to consent
to working in the tower and his lack of refresher training.

When Plaintiff returned to work in the Transportation Department in May 2014, his
position was still under Supervisor Roop.   On May 16, 2014, Ricevuto ordered Plaintiff to
undergo a second DOT pre-employment test based on her own interpretation and understanding
of the relevant federal regulation, 40 C.F.R. § 219.501, which states as follows:   "No railroad
may allow a covered employee to perform covered service, unless the employee has been
administered a test for drugs with a result that did not indicate the misuse of controlled
substances."   Ricevuto interpreted this regulation as requiring that Defendant must have a
negative DOT pre-employment test on file for Plaintiff, which was to be administered by a third-
party collector and was not to be a direct-observation test.   Plaintiff disputed Ricevuto's
interpretation of the regulation and its application to him.   Plaintiff noted his protest on the
testing form, but again submitted to the test.

After Ricevuto retired in June 2014, Medical Services employee Suzanne Immel was
eventually appointed as the DER for Defendant.   Between July 26, 2014 and May 12, 2016,
Defendant's DERs, in compliance with SAP Reed's federally-required plan, ordered Plaintiff to
undergo 20 direct-observation follow-up urine drug tests.   Plaintiff verbally protested taking
each of the tests but submitted to all of them because he believed he could be fired from his job if
he did not.

On October 3, 2014, Plaintiff voluntarily left his clerk position in the Transportation
Department and took a new position as a Material Handler.   Plaintiff's position as a Material
Handler was a non-DOT, non-covered service/non-safety-sensitive position.   Plaintiff protested
to his supervisor when he was ordered, as a Material Handler, to submit to direct-observation
follow-up urine drug tests.   DER Immel, purportedly in error, ordered and scheduled at least two
DOT breath-alcohol tests ("BAT") for Plaintiff when scheduling his direct-observation follow-up
urine drug tests.   Plaintiff did not consent to the tests but submitted to them to avoid termination.

On May 14, 2016, Plaintiff sent an email to Senior Manager of Medical Services, Kathy
Smolynec, Immel's superior, inquiring why he was being administered direct-observation
follow-up urine tests while employed in the non-DOT position of Material Handler and
questioned why he was being ordered to take BATs.   On May 20, 2016, after consulting Immel,
Smolynec responded to Plaintiff's email, offering him the choice to either continue with the
remainder of the direct-observation urine tests required by SAP Reed's plan or to switch to non-
direct-observation urine tests.   If Plaintiff chose the latter route, he would not be permitted to
return to a federally-regulated position in the future.   Smolynec informed Plaintiff that in either
case, the urine drug testing would continue until the number of tests required by SAP Reed's
follow-up plan were completed.   Smolynec also apologized to Plaintiff for the BATs, stating
that they were scheduled in error and would not be repeated.

On May 21, 2016, Plaintiff wrote to Smolynec and stated that he was electing to continue with the non-direct-observation urine drug tests for those remaining under SAP Reed's plan. In his email, Plaintiff confirmed that he understood that he would not be permitted to return to a federally-regulated position in the future, and that he had no intention of doing so. Plaintiff admits that he did, in fact, return to a federally-regulated position in 2017, which, he states, Defendant forced him to do. Although Immel believed that all of Plaintiff's follow-up urine drug tests should have continued as direct-observation tests until SAP Reed's plan was complete, she was directed by Smolynec to administer the remainder of Plaintiff's urine drug tests after May 20, 2016 as non-direct-observation tests.

Pursuant to this direction, Immel ordered Plaintiff's last two follow-up urine drug tests between June 22, 2016 and September 29, 2016 to be non-direct-observation tests.

**Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court views the evidence and draws all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**Analysis**

"The common law claim of intrusion upon seclusion includes the following elements: (1) an unauthorized intrusion or prying into the plaintiff's seclusion; (2) an intrusion that is highly offensive or objectionable to a reasonable person; (3) that the matter upon which the intrusion occurs is private; and (4) the intrusion causes anguish and suffering." *Angelo v. Moriarty*, 15 C 8065, 2016 WL 640525, at *4 (N.D. Ill. Feb. 18, 2016) (internal quotation marks and citation omitted). "In short, 'the core of this tort is the offensive prying into the private domain of another.'" *Id*. (citation omitted).

Defendant first contends that Plaintiff's claim is barred by the statute of limitations. While it appears to still be an open question in Illinois, the most recent authority indicates that courts apply the five-year catch-all statute of limitations in 735 ILCS 5/13-205. *See Johnson v. Northshore Univ. Healthsystem*, No. 1-10-0399, 2011 WL 10069086, at *3 (Ill. App. Ct. Mar.

31, 2011).[3]  Plaintiff alleges that he should not have been subject to drug testing after October 2013 and sued in May 2018, within the statute of limitations.

Defendant also contends that the instant action is barred by res judicata.  If another tribunal has already decided an issue, or could have decided an issue, then a subsequent action may not address the same issue and "invalidate rights previously established in the prior proceedings."  *Allahar v. Zahora*, 59 F.3d 693, 696 (7th Cir. 1995).  Plaintiff filed a charge with the Illinois Department of Human Rights ("IDHR") on February 24, 2017.  Plaintiff's charge in the IDHR matter included allegations of "frequent strip search drug testing" and "harassment" for drug testing done from November 1, 2013 through September 29, 2016.  In his IDHR complaint, Plaintiff sets out the dates and types of tests about which he was complaining, including identifying whether it was a DOT direct-observation strip-search test, a DOT alcohol test or a non-DOT alcohol test.  (Def.'s Ex. Z, Dkt. # 135-20, at PageID ##:1406-07.)  According to Plaintiff, his supervisors "took no action to stop the strip[-]search drug testing," and his complaint was based in part on the "repeated act of sexually abusive testing" he was forced to undergo.  Plaintiff's IDHR matter was dismissed on September 13, 2019 for lack of substantial evidence and lack of jurisdiction.

Defendant maintains that the dismissal order became a final order on December 18, 2019, when Plaintiff did not file a request for review of the dismissal by the deadline or take any other legal action to contest the dismissal order.  Therefore, Defendant argues, because Plaintiff did not litigate his intrusion-upon-seclusion claim before the IDHR, he is barred from doing so here.  But even assuming the IDHR order was final, the parties do not address, and it is not clear to the Court, that Plaintiff had a full and fair opportunity to litigate his claim in front of the IDHR.  As an initial matter, Defendant cites to no authority that the IDHR has jurisdiction over a state-law intrusion-upon-seclusion claim such that it "could have decided" the claim.  Moreover, from the records provided to the Court, no hearing was had; only an IDHR investigation occurred.  As a result, the Court cannot conclude that Plaintiff had a full and fair opportunity to litigate his claims such that res judicata bars the instant case.  *See Sabin v. Yellow Transp., Inc.*, No. 04 C 193, 2006 WL 2192007, at *8 (N.D. Ill. July 31, 2006) (because it did "not appear that an administrative agent or body conducted a hearing on the merits of Plaintiff's case and resolved disputed issues of fact," and only that "the U.S. Secretary of Labor investigated Plaintiff's complaint and issued a final report," the findings were "insufficient to preclude Plaintiff from litigating his retaliatory discharge claim in federal district court").[4]

Defendant further asserts that Plaintiff's claim is impliedly preempted by Federal Railroad Administration ("FRA") rules and regulations, which govern testing procedures and

---

[3]  The Court acknowledges that the *Johnson* case is an unpublished opinion that cannot be cited as precedent under Illinois Supreme Court Rule 23.  The Court cites it as persuasive authority, not binding precedent.

[4]  *See also Univ. of Tenn. v. Elliott*, 478 U.S. 788, 797 (1986) ("[I]t is sound policy to apply principles of issue preclusion to the factfinding of administrative bodies acting in a judicial capacity.").  It is not clear what, if any, factfinding occurred, or whether the IDHR acted in a judicial capacity.

qualifications for railroad company employees.[5]   49 C.F.R. § 219.   As the Seventh Circuit has noted, however, "in the interest of avoiding unintended encroachment on the authority of states, . . . a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find preemption."   *Burlington N. & Santa Fe Ry. v. Doyle*, 186 F.3d 790, 794 (7th Cir. 1999) (citations omitted).   "Preemption will not lie unless it is the clear and manifest purpose of Congress."   *Id.*   The relevant question for preemption is whether the FRA has "issued regulations 'covering' the same subject matter" as the state-law claim of intrusion upon seclusion.   *Rogers v. BNSF Ry.*, No. 19 C 3083, 2019 WL 5635180, at *4 (N.D. Ill. Oct. 31, 2019).   "[P]re-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law."   *Id.* (internal quotation marks and citation omitted).

The Court finds that federal regulations regarding drug testing of railroad employees in safety-sensitive positions do not completely subsume the subject matter of an individual's right, under state law, to be free from an unauthorized intrusion into a private matter, which a reasonable person would find offensive or objectionable.   While the state-law claim touches on, in this case, the existence of federal drug-testing regulations, it does not "conflict with or prevent achievement of federal objectives" regarding railroad safety.   *Norfolk S. Ry. v. Box*, 556 F.3d 571, 572 (7th Cir. 2009); *see also Rogers*, 2019 WL 5635180, at *4 (rejecting argument that the FRSA preempts the Illinois Biometric Information Protection Act, stating that   "[t]he federal rules requiring railroads to adopt physical security measures do not 'cover' the subject of disclosures and consents required to obtain and store biometric information").[6]

In a supplement to its motion for summary judgment, Defendant argues that Plaintiff's claim should have been brought under the Federal Employer's Liability Act ("FELA"), and because it was not, the claim must be dismissed.   "FELA claims only concern injuries, emotional or physical, that result from physical contact or the threat of physical contact."   *Roberts v. CSX Transp., Inc.*, No. 1:06-CV-00169, 2006 WL 1763640, at *3 (N.D. Ind. June 26, 2006).   Plaintiff does not allege physical contact or the threat of physical contact, so if he had sued under FELA, the claim would have failed.   But was he required to invoke FELA?   The Court finds persuasive the reasoning of other courts in this circuit that he was not.   *See Starks v. Ne. Ill. Reg'l Commuter R.R.*, 245 F. Supp. 2d 896, 900 (N.D. Ill. 2003) ("This court agrees with *Harris–Scaggs* that nothing in the statutory design of FELA or its subsequent judicial interpretations compels a conclusion that FELA 'occupies the field' to such an extent that non-actionable FELA claims cannot be pursued as state[-]law torts.") (citing *Harris–Scaggs v. Soo Line R.R. Co.,* 2 F. Supp. 2d 1179, 1185 (E.D. Wis. 1998)).

---

[5]   In the Federal Railroad Safety Act ("FRSA"), the Secretary of Transportation was given the authority to "prescribe regulations and issue orders for every area of railroad safety."   49 U.S.C. § 20103(a).   The Secretary of Transportation delegated its responsibility to prescribe railroad safety regulations to the Federal Railroad Administration ("FRA"), which promulgates and enforces the federal regulations.   49 C.F.R. § 1.89.   The Court refers to the relevant preemption issue as FRSA and FRA preemption interchangeably.

[6]   While Defendant cites to numerous cases in which courts have rejected privacy claims based upon drug testing by employers, these cases do not address federal preemption of those state-law claims.

Finally, with respect to the merits, Defendant argues that: (1) the alleged intrusion fails to meet the criteria for actionable intrusion under Illinois law, and, even if it did, Plaintiff knowingly consented to each alleged intrusion upon his seclusion; (2) the material facts do not establish, as a matter of law, the requisite intent associated with the alleged intrusion under Illinois law; and (3) the tests that were administered to Plaintiff are not, as a matter of law, highly offensive under Illinois law. The Court need not address these arguments because it is clear from even a brief perusal of the facts that genuine issues of material fact exist with respect to Plaintiff's claim. As an initial matter, there were numerous tests performed with different circumstances for each one. Moreover, Defendant acknowledges that it made errors in the timing and need for certain of the blood alcohol tests it administered to Plaintiff, and that it was fined for misapplying certain regulations to Plaintiff. Further, Plaintiff's job was not consistent throughout the term of his employment, and he contends that he did not consent to the tests but only submitted to them under fear of termination. Even setting aside the dueling expert testimony on the reasonableness of the testing, the circumstances and bases for the numerous drug tests are disputed. Thus, the Court cannot make an across-the-board determination on the issues of intent, consent, or whether the tests were highly offensive.

**Conclusion**

For these reasons, Defendant's motion for summary judgment is denied.

**Date**: February 10, 2021

Ronald A. Guzmán
United States District Judge